ORAL ARGUMENT SCHEDULED FOR JANUARY 15, 2016

No. 15-7049

# In the United States Court of Appeals
# for the District of Columbia Circuit

_____

UNITED STATES OF AMERICA, EX REL. ANTHONY OLIVER,
APPELLANT

*v.*

PHILIP MORRIS USA INC.,
A VIRGINIA CORPORATION, FORMERLY KNOWN AS PHILIP MORRIS INC.,
APPELLEE

_____

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 08-0034, HON. COLLEEN KOLLAR-KOTELLY, DISTRICT JUDGE

_____

**BRIEF OF APPELLEE
PHILIP MORRIS USA INC.**

_____

THOMAS J. FREDERICK
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601*
*(312) 558-5600*

ELIZABETH P. PAPEZ
ANDREW C. NICHOLS
ERIC M. GOLDSTEIN
ERIC T. WERLINGER
WILLIAM B. JACKSON
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*
*epapez@winston.com*

*Counsel for Appellee Philip Morris USA Inc.*

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1 and 28(a)(1), Philip Morris USA Inc. ("PM USA") certifies as follows:

<u>Parties and Amici</u>:    Relator-Appellant Anthony Oliver and Defendant-Appellee PM USA were parties to the operative (Second Amended) complaint in the United States District Court for the District of Columbia.  The United States chose not to intervene.  (Dkt. 28.)  There are no intervenors or amici on appeal.

Oliver's original and First Amended Complaints named the following entities as defendants:  PM USA's predecessor Philip Morris Incorporated, Altria Group, Inc., R.J. Reynolds Tobacco Company, Reynolds American, Inc., Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Loews Corporation, and British American Tobacco, PLC.  Oliver omitted these defendants from his Second Amended Complaint, and they are not parties to this appeal.

PM USA is a wholly owned subsidiary of Altria Group, Inc., which is publicly held and has no parent company.  No publicly held company owns 10% or more of the stock of Altria Group, Inc.  Altria Group, Inc. is the only publicly held company that owns 10% or more of PM USA's stock.

<u>Rulings Under Review</u>:  Oliver appeals the April 30, 2015 final judgment entered by the United States District Court for the District of Columbia (Kollar-Kotelly, J.), granting PM USA's motion to dismiss this case for lack of subject-

matter jurisdiction. *See* No. 08-0034, *U.S. ex. rel. Anthony Oliver v. Philip Morris USA Inc.*, --- F. Supp. 3d ---, 2015 WL 1941578 (D.D.C. 2015).

<u>Related Cases</u>: No related case is pending before this or any other court. This case has been before this Court on one prior occasion, reported at *U.S. ex. rel. Anthony Oliver v. Philip Morris USA Inc.*, 763 F.3d 36 (D.C. Cir. 2014) (JA280-293).

|  |  |
|---|---|
| | /s/ Elizabeth P. Papez |
| THOMAS J. FREDERICK | ELIZABETH P. PAPEZ |
| *Winston & Strawn LLP* | ANDREW C. NICHOLS |
| *35 W. Wacker Drive* | ERIC M. GOLDSTEIN |
| *Chicago, IL  60601* | ERIC T. WERLINGER |
| *(312) 558-5600* | WILLIAM B. JACKSON |
| | *Winston & Strawn LLP* |
| | *1700 K Street, N.W.* |
| | *Washington, DC  20006* |
| | *(202) 282-5000* |
| | epapez@winston.com |

*Counsel for Appellee*
*Philip Morris USA Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY .................................................................... viii

INTRODUCTION ........................................................................1

COUNTER-STATEMENT OF ISSUES ON APPEAL ...........................6

PERTINENT STATUTES ...........................................................6

FACTUAL AND PROCEDURAL BACKGROUND ...............................6

    A.    The False Claims Act ...........................................6

    B.    MFC Provisions...................................................8

    C.    This Suit ...........................................................9

    D.    Oliver's Operative Complaint ............................10

    E.    First Jurisdictional Dismissal ...........................11

    F.    This Court's Decision in *Oliver I* ......................14

    G.    Second Jurisdictional Dismissal........................15

SUMMARY OF ARGUMENT ..................................................19

STANDARD OF REVIEW ......................................................22

ARGUMENT ......................................................................23

I.    THE ICELAND MEMO AND MFC TERMS TOGETHER DISCLOSE THE "ESSENTIAL ELEMENTS" OF THE ALLEGEDLY FRAUDULENT TRANSACTIONS ON WHICH THIS "ACTION" "IS BASED."......................................................................23

    A.    Oliver Misstates the Controlling Jurisdictional Test...........26

        1.    Oliver's Pricing Arguments Are Irrelevant to Jurisdiction, but Confirm the Complaint Is Inadequately Pled. ...................27

iii

2.     Oliver's "Fraudulent Certification" Arguments Also Do
       Not Avoid the Jurisdictional Bar. ...............................................33

B.     The District Court Correctly Identified "X" and "Y." ......................36

II.   THE MFC TERMS AND ICELAND MEMO WERE PUBLICLY
      DISCLOSED THROUGH FCA CHANNELS. ...........................................39

A.     The Iceland Memo Was Disclosed Through Two FCA Channels. ....39

1.     The Iceland Memo Was Disclosed In a "Civil Hearing." ........40

2.     The Iceland Memo Was Also Disclosed in the News
       Media........................................................................................42

B.     The MFC Provisions Were Disclosed Through "Administrative
       Reports" and the "News Media." .......................................................46

1.     The MFC Terms Were Disclosed in "Administrative
       Reports." ...................................................................................47

2.     The MFC Provisions Were Also Disclosed in the "News
       Media.".......................................................................................49

III.  THE DISTRICT COURT PROPERLY REJECTED OLIVER'S NEW
      "ORIGINAL SOURCE" CONTENTIONS. .................................................51

A.     Oliver's Original-Source Allegations Are Unpled and Untimely.......52

B.     Oliver's Original-Source Claim Is Also Substantively Deficient.......54

CONCLUSION .......................................................................................................60

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................4, 21, 23, 28, 30, 54

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................23

*Conley v. Gibson*,
  355 U.S. 41 (1957).........................................................................23

*Crocker v. Piedmont Aviation, Inc.*,
  49 F.3d 735 (D.C. Cir. 1995)...............................................................16

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*,
  315 F.3d 338 (D.C. Cir. 2003).............................................................23

*Graham County Soil & Water Conservation District v. U.S. ex rel. Wilson*,
  559 U.S. 280 (2010)........................................... 4, 26, 30, 41, 44-45, 50

*Jones v. Bernanke*,
  557 F.3d 670 (D.C. Cir. 2009).........................................................23, 53

*Marshall County Health Care Authority v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993).........................................................31

*National Security Archive v. Department of Defense*,
  880 F.2d 1381 (D.C. Cir. 1989)...................................................... 43-44, 51

*Rockwell International Corp. v. United States*,
  549 U.S. 457 (2007)...................................... 1, 3, 6, 11, 20-21, 26-27, 28, 52-53

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  131 S. Ct. 1885 (2011)......................................... 5, 15, 18, 41, 45-49

*U.S. ex rel. Davis v. District of Columbia*,
  793 F.3d 120 (D.C. Cir. 2015)...............................................................16, 34

*U.S. ex rel. Doe v. Staples, Inc.*,
  773 F.3d 83 (D.C. Cir. 2014)..........................................26, 34, 36, 38-39, 49-50

*U.S. ex rel. Estate of Cunningham v. Millennium Labs. of Cal., Inc.*,
    713 F.3d 662 (1st Cir. 2013) ...............................................................54

*\*U.S. ex rel. Findley v. FPC Boron Emps.' Club*,
    105 F.3d 675 (D.C. Cir. 1997) ...............................3, 22, 36, 53, 55, 59

*U.S. ex rel. Fried v. West Independent School District*,
    527 F.3d 439 (5th Cir. 2008) ...............................................................50

*U.S. ex rel. Green v. Service Contract Education & Training Trust Fund*,
    843 F. Supp. 2d 20 (D.D.C. 2012) .................................................22, 54

*U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*,
    415 F.3d 601 (7th Cir. 2005) ...............................................................53

*U.S. ex rel. Heath v. AT & T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015) .......................................................31, 34

*U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*,
    756 F.3d 1075 (8th Cir. 2014) .............................................................50

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
    69 F. Supp. 3d 416 (D. Del. 2014) ...........................................43-44, 51

*U.S. ex rel. Newell v. City of St. Paul*,
    728 F.3d 791 (8th Cir. 2013) ...............................................................56

*U.S. ex rel. Osheroff v. Humana, Inc.*,
    776 F.3d 805 (11th Cir. 2015) .............................................................50

*\*U.S. ex rel. Reagan v. East Texas Medical Center Regional Healthcare
Sys.*, 384 F.3d 168 (5th Cir. 2004) ...............................................57-58

*\*U.S. ex rel. Settlemire v. District of Columbia*,
    198 F.3d 913 (D.C. Cir. 1999) ........................ 11, 19, 24, 27, 30-31, 36

*\*U.S. ex rel. Springfield Terminal Railway Co. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) ........................ 7, 19, 21-22, 25-27, 32, 36, 40-42
    ..............................................................................................55, 57, 60

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
    389 F.3d 1251 (D.C. Cir. 2004) ..........................................................31

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ................................................................4

*United States v. Philip Morris Inc.*,
   No. 99-CV-02496 (D.D.C. 2006) ........................................................40

*United States v. Philip Morris Inc.*,
   No. 99-CV-02496 (D.D.C. 1999) ........................................................12

*\*United States v. Science Applications International Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ................................... 4, 7-8, 32, 34, 36

*Utah v. RJ Reynolds Tobacco Co.*,
   No. 96-CV-00829 (D. Utah 2006) ......................................................59

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002) .........................................................20

## STATUTES & RULES

\*False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ...........................1, 6-7, 11, 13, 20-22,
   .........................................................24, 26, 30, 34, 39, 40,44-45, 47, 49, 52, 55

D.C. Cir. R. 28(a)(5) ...............................................................................6

Fed. R. App. P. 32(a)(7)(B)(iii) .............................................................6

Fed. R. Civ. P. 8 .................................................................... 4, 11-12, 32

Fed. R. Civ. P. 9(b) .........................................................4, 7, 11-12, 32-33

Fed. R. Civ. P. 12 ...........................................................3, 13, 15, 21, 25

## OTHER AUTHORITIES

*Webster's Third New International Dictionary* (1986) ...................... 43-44

*Authorities upon which we chiefly rely are marked with asterisks.

## GLOSSARY

**Exchanges:**     Army and Air Force Exchange Service (AAFES) and Navy Exchange Service Command (NEXCOM)

**FCA**:     False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

**Iceland Memo**:     1999 Philip Morris USA Inc. memorandum published online

**JA**:     Joint Appendix

**MFC**:     Most Favored Customer

**OBr.**:     Appellant Anthony Oliver's Opening Brief

**PM USA**:     Philip Morris USA Inc.

**PMI**:     Philip Morris International, Inc.

# INTRODUCTION

This appeal presents a discrete jurisdictional question:  whether the district court correctly dismissed relator Anthony Oliver's third complaint under the False Claims Act ("FCA") provision barring jurisdiction over *qui tam* "actions" where the "relator's allegations" are "'based upon'" elements in the public domain. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463, 473 (2007) (quoting 31 U.S.C. § 3730(e)(4)(A)).[1]  The answer is yes, and this Court should affirm.

Oliver is the head of a discount tobacco company that competes with defendant Philip Morris USA ("PM USA") for sales to government agencies that require most-favored-customer ("MFC") pricing.  The operative complaint in this 2008 suit accuses PM USA of falsely certifying that its sales to two U.S. military agencies ("the Exchanges") complied with such pricing and seeks over a hundred million dollars in relief and penalties.  The district court first dismissed the Complaint in 2012 because its "essential [price and procurement] elements" were already public when Oliver filed suit.  (JA 269-74.)  The price disparity the Complaint describes was disclosed in a 1999 memorandum—the "Iceland Memo"— PM USA produced to the government in litigation and published online pursuant to a court order.  And the MFC obligations Oliver says PM USA falsely certified were available to the public by request and on the Exchanges' websites since at

---

[1] All FCA cites refer to the 2008 version of Title 31 that governs this suit.

least 2003. In 2013, this Court nonetheless vacated the dismissal because it held that "even assuming" the Iceland Memo and MFC provisions disclosed the certifications Oliver challenges, the record at the time did not establish the provisions' pre-2008 disclosure on the Exchanges' websites. (JA287-88.) On remand, PM USA proved these disclosures and Oliver concedes "PM USA has now shown that the [MFC provisions] were posted on the Internet" in 2002 and 2003. (Oliver Brief ("OBr.") 29.) The judgment below holds that the MFC and pricing disclosures in the current record "together" reveal the "essential elements" on which this "action" is "based," and dismisses the suit as jurisdictionally barred. (JA 522-23, 528.)

Oliver's appeal, which concedes the admissibility of the Internet disclosures, asks this Court to turn FCA law upside-down. According to Oliver, the jurisdictional bar requires public disclosure of details and evidence that are indisputably absent from his Complaint. This assertion turns pleading weaknesses into jurisdictional strengths in violation of the statute and controlling law, including *Oliver I*.

Oliver's main argument is that the current record does not cure the grounds on which this Court "vacated and remanded" the first judgment, because even public disclosure of *both* the Iceland Memo and MFC requirements does not disclose pricing details or express certifications necessary to show "PM USA's *fraudulent* pricing." (OBr. 32.)[2] This argument disregards the FCA's directive that the bar

---

[2] All emphasis in this brief is supplied unless otherwise noted.

turns on the relationship between the public disclosures and "relator's allegations" in the operative "complaint." *Rockwell*, 549 U.S. at 472-73; *U.S. ex rel. Findley v. FPC Boron Emps.' Club*, 105 F.3d 675, 691 (D.C. Cir. 1997). Oliver's Complaint does not contain the pricing details he says are missing from the Iceland Memo, (OBr. 4, 34-37); nor does it identify any express "false certification" that could have been disclosed separate from the MFC terms themselves. (OBr. 33.) Accordingly, the pricing details and express certifications Oliver describes are irrelevant to the jurisdictional inquiry, and the district court did *not* use the "wrong equation" in its bar analysis. (*Id.*) It properly held that the price disparities documented in the Iceland Memo, "together" with online disclosure of the MFC terms the Complaint cites as the basis for FCA liability, reveal the "essential elements" upon which *this* "*action*" is "based." (JA522-23 (quoting JA17, 19, ¶¶ 11, 17).)

Oliver's appeal asks this Court to (i) divorce the jurisdictional inquiry from the "action" it governs by requiring public disclosures to reveal details the Complaint does not plead, and (ii) excuse these pleading defects under Rule 12 where a relator "has not yet been afforded discovery." (JA22-23, ¶¶ 30, 34.) Both requests violate controlling law. The jurisdictional argument disregards the FCA's directive that the bar inquiry focus on whether the "action"—as defined by "relator's allegations"—is "based upon" elements in the public domain. *Rockwell*, 549 U.S. at 472-73. If it is, the bar applies, and it is irrelevant whether the public disclosures

3

themselves reveal an actionable fraud.  Oliver's contrary argument would give a jurisdictional pass to *qui tam* actions that are "based upon" public disclosures but do not adequately plead fraud.  That approach defies the statute and makes no sense because it is "beyond cavil … that Congress passed the public disclosure bar to *bar* a subset of [*qui tam*] suits that it deemed unmeritorious."  *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 298 (2010) (emphasis original).  The district court correctly held that this is such an action.

Oliver's arguments for reversal not only disregard the proper jurisdictional inquiry, but also upend settled pleading standards.  "[I]f allowed to go forward, [his] FCA claim would have to rest primarily on facts learned through the costly process of discovery. … This is precisely what Rule[s] [8 and] 9(b) seek[] to prevent."  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008) (citation omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 687-88 (2009).  Oliver cites no authority for allowing such a result, particularly where, as here, a suit alleges a massive fraud on the military that the government refused to pursue after a four-year investigation and that multiple amended complaints fail to plead in accordance with legal requirements designed to ensure that relators do not "abuse" *qui tam* suits by using implied certification claims to "convert[]" "ordinary breaches of contract" into draconian "FCA liability."  *United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257, 1270-71 (D.C. Cir. 2010).

Oliver's remaining arguments are unavailing and attack a series of straw men. Oliver's assertion that the essential elements of his suit were not disclosed through FCA-prescribed channels, (OBr. 39-55), mischaracterizes the judgment below and conflicts with Supreme Court precedent. The district court did not hold that all government contract provisions are "administrative report[s]," (OBr. 42), that all discovery materials qualify as disclosures in a "civil hearing," (OBr. 27, 50), or that any "readily accessible website[]" qualifies as "news media," (OBr. 44). The district court simply held that court-ordered publication of the Iceland Memo and the Exchanges' official online MFC provisions were publicly disclosed for FCA purposes. These record-specific rulings accord with the FCA and settled law, and Oliver's arguments otherwise are foreclosed by Supreme Court cases holding that the FCA's disclosure channels are "broad" to the point of "redundancy" and encompass disclosures even to a single individual. *E.g.*, *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011) (citing cases).

The public disclosure bar applies here for the reasons above, and Oliver cannot escape it by offering a belated declaration that he is an "original source." His declaration violates pleading and timing requirements that alone compel affirmance. And its substantive arguments depend on information from third parties and public documents outside this Court's definition of the "direct and independent" knowledge the FCA requires. The Court should affirm the judgment.

## COUNTER-STATEMENT OF ISSUES ON APPEAL

1.     Did the district court correctly hold that Oliver's "claims are based upon publicly disclosed information" that triggers the FCA's jurisdictional bar? (JA528.)

2.     Did the district court correctly hold that the public disclosures in the current record occurred through FCA-approved channels?  (JA515-22.)

3.     Did the district court correctly hold that Oliver cannot avoid the jurisdictional bar on the basis that he is an "original source"?  (JA528.)

## PERTINENT STATUTES

Excerpts of the statutory provisions that control this case are reproduced in the Addendum.  *See* Fed. R. App. P. 32(a)(7)(B)(iii); D.C. Cir. R. 28(a)(5).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The False Claims Act

The FCA prohibits "false or fraudulent claims for payment to the United States."  *Rockwell*, 549 U.S. at 463 (citing § 3729(a)).  The Act authorizes civil actions "to be brought by … private individuals in the Government's name."  *Id.* These individuals, known as "relators," are entitled to litigate the case, share in any favorable judgment, and recover attorneys' fees, § 3730(d) (2012), but only if their claims comply with certain statutory requirements.

Relators first file their suits under seal so the Department of Justice can investigate the claims and decide whether to intervene before the complaint is served

6

on the defendant. *Id.* § 3730(b)(4)(A). Where, as here, the government declines intervention, (Dkt. 28), the FCA imposes two critical limitations on the relator's ability to proceed.

*First*, the Act's public-disclosure bar "divests courts of subject matter jurisdiction over an action 'based upon the public disclosure of allegations or transactions' made in specified types of fora, 'unless the … person bringing the action is an original source of the information.'" (JA283 (quoting § 3730(e)(4)(A)).) The bar "discourage[s] … opportunistic plaintiffs who have no significant information to contribute on their own," while providing "adequate incentives for whistle-blowing insiders with genuinely valuable information" to come forward. *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994). This Court describes the public disclosure inquiry as an equation:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.

(JA286 (quoting *Quinn*, 14 F.3d at 654).)

*Second*, where a relator's FCA suit is based on the defendant's alleged breach of a government contract, courts "must be sure … that liability … attaches only for fraud and not for ordinary breach of contract." *SAIC*, 626 F.3d at 1277. Accordingly, reviewing courts must ensure "strict enforcement" of Rule 9(b) and

"the Act's materiality and scienter requirements" where, as here, a complaint alleges false claims based on contract non-compliance. *Id.* at 1270.

### B.    MFC Provisions

Oliver concedes that this action turns on MFC provisions incorporated at all relevant times in federal procurement requirements.  (OBr. 16-18; JA18-19, ¶¶ 11, 14, 16-17, 19.)  The Exchanges that issued the provisions here—the Army and Air Force Exchange Service and Navy Exchange Service Command—are instrumentalities of the U.S. Department of Defense that operate military exchanges at which members of the Armed Forces and their families purchase products.  (JA16, ¶ 7.)  Oliver's allegations concern the prices at which PM USA sold cigarettes to the Exchanges for resale at military exchanges overseas.  (JA21-22, ¶¶ 25-29.)  That is important because the MFC provisions governing his claims concern only the prices, terms, and conditions the "contracting entity"—PM USA—offers similarly situated customers for the same products in "comparable" markets.  (OBr. 16-18; JA18-19, ¶¶ 14, 16.)  Thus, the MFC provisions are not implicated, much less violated, by sales that involve products, terms, customers, or markets *different* than the Exchange sales Oliver describes.  (JA17-24, ¶¶ 10-38.)

*Army Exchange Provisions*.  The first MFC provision Oliver cites is part of the Army Exchange's General Provisions and Supplier Requirements.  From 1995 through 2007, these regulations stated that the net price a Contractor (here, PM

USA) offers the Exchange "will be as favorable as, or better than the price the item is being *sold by the Contractor* to other customers *under the same or similar conditions and in the same general geographical area pursuant to agreements made during the same period*."  (JA18, ¶ 16.)  Beginning in December 2007, the regulation was updated to require contractors to offer Army Exchange prices "*comparable to*" the "*prices, terms, and conditions* that have been offered *by the Contractor* to any of its customers."  (JA19, ¶ 19.)

*Navy Exchange Provisions*.  The second MFC requirement Oliver cites is part of Publication 61 of the Navy Exchange's General Provisions.  In relevant part, contractors agree to certify that "*prices, terms and conditions offered* under [their Exchange] contract, including consideration of any discount [or] rebate arrangements, *do not exceed prices then being charged the Contractor's most favored customer or another military exchange for like items*."  (JA18, ¶ 14(a).)

## C.    This Suit

Oliver is the President and CEO of Medallion Brands International Co., a tobacco-product manufacturer that seeks to compete with PM USA in selling cigarettes to the U.S. military.  (Dkt. 8, Am. Compl. ¶¶ 11-12.)  He filed his original complaint under seal against PM USA and several other companies in January 2008, and first amended it in September 2008.  (Dkt. 8.)  Oliver alleged that his competitors "scam[med]" the military in two ways.  First, they allegedly "de-

9

ceiv[ed]" the military "into believing" that their prices reflected payments required under the companies' widely publicized 1998 Master Settlement Agreement with State attorneys general over tobacco-related health care costs.  (*Id.* ¶ 12.)[3]  Second, they allegedly certified that their military sales complied with MFC obligations when they were purportedly charging non-military customers lower prices that rendered the certifications false.  Based on these claims Oliver sought nearly $300 million in damages and penalties.  (*Id*. ¶¶ 68, 72, 74.)

In September 2011, after investigating Oliver's claims for nearly four years, the United States notified the district court that it would not intervene.  (Dkt. 28, JA14.)  The Amended Complaint was then unsealed, and after several months of delay, Oliver served PM USA.  (Dkt. 33, JA13.)  In June 2012, Oliver declared his intent to amend his complaint again.  (Dkt. 47, JA11.)  Shortly thereafter, Oliver filed the operative Second Amended Complaint ("Complaint").  (JA15-28.)

### D.    Oliver's Operative Complaint

The current Complaint abandons all but Oliver's MFC claims against PM USA and drops his original-source allegations altogether.  (*Id.*)  Accordingly, and as Oliver's opening brief confirms, (OBr. 18-20), the Complaint now rests on two principal assertions:  (1) PM USA's sale of certain cigarettes to the Exchanges vio-

---

[3] Most major tobacco manufacturers, including PM USA's predecessor Philip Morris Incorporated, signed the Master Settlement Agreement to resolve state claims for costs associated with smoking-related illnesses.  (Dkt. 8, ¶¶ 13-16.)

lated its MFC obligations because PM USA purportedly sold the same cigarettes to non-military customers—specifically its current affiliate PM Duty Free and former affiliate Philip Morris International ("PMI")—at lower prices, (JA25; OBr. 18); and (2) PM USA violated the FCA by "falsely warrant[ing]" compliance with its MFC obligations every time it billed the Exchanges, (OBr. 20; JA21-24, ¶¶ 26-29, 31-35). Oliver's factual allegations in support of these claims span just five pages and offer just one (flawed) example of the price difference he cites as evidence of PM USA's purported MFC non-compliance; fail specifically to identify any allegedly fraudulent claims or invoices, (JA23, ¶¶ 31-33); and do not plead that Oliver is an "original source," (JA15-28).

### E.    First Jurisdictional Dismissal

PM USA initially moved to dismiss the Complaint with prejudice for two reasons. (JA32-70.) First, the FCA's public disclosure bar, § 3730(e)(4)(A), precludes jurisdiction because the Complaint "'describ[es] allegations or transactions substantially similar to those in the public domain,'" and Oliver is not an "'original source.'" (JA48-49 (quoting *U.S. ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999), and *Rockwell*, 549 U.S. at 460, respectively), 232-45.) Second, the Complaint fails to state a plausible FCA claim under Federal Rules of Civil Procedure 8 and 9(b). (JA54-69; 245-53.)

***Grounds for Dismissal.*** PM USA argued that the "X" in Oliver's FCA equation—the alleged disparity between PM USA's military pricing and its corporate affiliate's (PMI's) duty-free pricing—was publicly disclosed in the Iceland Memo. (JA50-54, 237-41.) This 1999 memo states in relevant part:

> PMI Duty-Free list prices are lower than PM USA Military tax-free prices and we frequently receive inquiries from the Service Headquarters on why they can't purchase tax-free product at these lower prices.

(JA74.) This is the same—and only—type of price disparity the Complaint alleges. (JA21, ¶¶ 14, 16, 19, 24-27.) Accordingly, the Complaint is "based upon" a price disparity that was publicly disclosed at least five years before Oliver filed suit, both when it was published online pursuant to a court order, (JA51-52; 73-80); *United States v. Philip Morris Inc.*, No. 1:99-CV-02496-GK (D.D.C. filed Sept. 22, 1999), and when it was later copied to an online university archive in 2003, (JA52 (citing http://legacy.library.ucsf.edu)). PM USA also argued that the "Y" in Oliver's FCA equation—the MFC provisions—were publicly disclosed online and to requesting vendors at all times (2002-10) relevant to this suit. (JA50.)

In addition to these jurisdictional grounds for dismissal, PM USA independently argued that the Complaint fails to state a claim under Rules 8 and 9(b) because it fails to plead, plausibly and with particularity, that PM USA: (1) actually violated its MFC obligations; (2) misrepresented these violations to the

12

Exchanges; and (3) made these misrepresentations knowing they were both objectively false and material to the Exchanges' decision to pay for the contested sales. (JA54-69, 245-53 (citing authorities).)

   ***The District Court's Judgment Dismissing the Case.***   The district court never reached PM USA's "argument under 12(b)(6)" because it concluded that the "case must be dismissed under 12(b)(1) for lack of subject matter jurisdiction." (JA260-61, 64-76.)   The court held that the Iceland Memo was "publicly disclosed" for FCA purposes because it was posted "online in a public, searchable database pursuant to a settlement agreement and subsequent court order," and was thus "disclos[ed] both in a 'civil hearing' and in the 'news media' within the meaning of the FCA's public disclosure bar."  (JA269.)

   The court then concluded that the Complaint rested on "transactions" (namely, military-versus-affiliate pricing differentials purportedly evidencing the falsity of PM USA's implied MFC certifications) that were already disclosed through the Iceland Memo and published MFC provisions.  Accordingly, the court held that the Complaint was "based upon" public disclosures that triggered § 3730(e)(4)(A)'s jurisdictional bar, (JA273), and dismissed the case because Oliver failed to qualify as an "original source," (JA276, 256).

## F.     This Court's Decision in *Oliver I*

On appeal, this Court held that the transactional test for the jurisdictional bar is satisfied "only if X *and* Y" were "in the public domain" before January 2008. (JA286-87 (emphasis original).)  The Court did not disturb the district court's holding that "X"—the price disparity central to Oliver's claims—was publicly disclosed for FCA purposes in the Iceland Memo.  (JA287.)  Regarding "Y," which it described as PM USA's "false certifications of compliance with the [MFC] provisions," (*id.*), the Court did not identify any express certifications.  It simply held that, "assuming *arguendo* [the allegedly false] certifications could be inferred from the disclosure of the MFC provisions, Oliver's suit is not barred because the [MFC] provisions were not publicly disclosed."  (JA287-88.)

The Court began by observing that the FCA's jurisdictional bar does not apply to "government … knowledge" of "*non-public* federal legal requirement[s]." (JA290.)  It then held that the MFC provisions were not publicly disclosed because the record did not establish that they were available "to the broader public" on the Internet before 2008.  (JA292.)  In reaching this conclusion, the Court did not address PM USA's argument that the MFC provisions were publicly disclosed for FCA purposes because they were disclosed to potential contractors (who are members of the public) "upon request" to the Exchanges.  (JA17-18, ¶¶ 10-11, 15.)  The Court also did not address the argument that these undisputed vendor disclosures

14

were indistinguishable from the disclosure in *Schindler*: an agency FOIA report to a single person (the relator's wife) in response to her specific request. (JA303 & nn.1-3, 305 n.5, 307-08 (citing *Schindler*, 131 S. Ct. at 1890-94).) *Oliver I* focused on the then-current record concerning the MFC terms' Internet disclosure and refused to consider PM USA's post-argument letter and authorities establishing their online publication in 2002 and 2003. (JA292-93.)

Rejecting the district court's alternative conclusion that "[t]he Iceland Memo, standing alone," triggered the jurisdictional bar, (JA291-92), the panel declined to address PM USA's non-jurisdictional Rule 12(b)(6) grounds for affirmance, (JA293-94), and vacated the judgment and remanded the case for further proceedings, (*id*.).

### G.     Second Jurisdictional Dismissal

On remand, PM USA again moved to dismiss the Complaint for lack of jurisdiction based on the archived web evidence this Court refused to consider in the first instance on appeal. (JA304, 308, 311-15.) PM USA's filings explained why *Oliver I* permitted PM USA's renewed motion despite Oliver's contrary arguments, (JA303-05 nn.3-5, 466-74), which Oliver ultimately conceded in urging the district court simply to forego its admitted authority to enter a second jurisdictional ruling because PM USA did not "expl[ain]" its failure to authenticate the MFCs' pre-2008 Internet disclosure earlier in the case, (JA430 n.7). Because PM USA

amply explained this point, (JA473-74), and Oliver does not seek reversal on the procedural grounds the district court rejected below, PM USA preserves but does not independently brief all aspects of the record supporting consideration of its renewed jurisdictional motion, (JA302-15, 466-90); *see U.S. ex rel. Davis v. District of Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015); *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 740-41 (D.C. Cir. 1995).[4]

Having disposed of Oliver's procedural contentions, PM USA reiterated that the "Iceland Memo was publicly disclosed through FCA channels," (JA479), and explained that its authentic evidence of pre-2008 Internet publication established that "the MFC provisions were publicly disclosed for FCA purposes either as administrative reports … [or] through the news media," (JA315 (citations omitted)). PM USA explained that this record "confirms that both essential elements ('X' and 'Y') of Oliver's [FCA] claim were in the public domain before January 2008," (JA315 (quoting JA286-94)), and compels dismissal because Oliver is not an "original source," (JA304 n.4).

***Oliver's Second Declaration.***   In support of his renewed original source claim Oliver submitted a new declaration, (JA508), reiterating that he "first learned of" PM USA's purported fraud "when, in the course of inquiring about the possi-

---

[4] The "abandon[ment]" language Oliver cites, (OBr. 12), did not account for the portions of PM USA's *Oliver I* brief asserting publication both "online" and "via request to the Exchanges," (JA303 & n.3), and is irrelevant here for the reasons above and in the district court's opinion, (JA307-08, 473-74).

bility of his own company … selling cigarettes to the military exchanges' overseas outlets, he ascertained that Phillip Morris, Inc. [sic] (PM USA's predecessor) and other tobacco manufacturers were including amounts to cover two surcharges" in their "prices to the [E]xchanges overseas that properly applied only to domestic sales." (JA439 (citing JA448-50, ¶¶ 3-5).) According to Oliver, "[i]t was my understanding at the time … that these surcharges were not applicable to overseas sales" of any kind—either civilian or military exchange—an "understanding" that supposedly "surprised" his contact at the Navy Exchange and certain other third parties with whom he allegedly discussed PM USA's pricing practices. (JA449-50, ¶ 5.) He then purported to "verify" these pricing practices—and specifically his "understanding" that PM USA was including MSA-related costs in its overseas military exchange prices when its affiliates were not including such costs in their overseas civilian duty-free prices—in conversations with various third parties, (OBr. 57), and "concluded" that this disparity was unlawful based on his "understanding" of the MFC provisions and another public legal document (the Master Settlement Agreement), (OBr. 23, 57).

> ***The District Court's Second Judgment Dismissing the Case.*** After carefully considering the parties' arguments and evidence, the district court issued a 26-page opinion explaining why "the Iceland Memo and the MFC provisions, together, are sufficient to trigger the public disclosure bar." (JA523.) As to "X," the

court reiterated that the Iceland Memo revealing the price disparity element of Oliver's claim was publicly disclosed through FCA-approved channels, noted that *Oliver I* "did not disturb that portion of this Court's ruling," (JA520), and held that on remand Oliver "does not offer any persuasive arguments" otherwise, (*id.* n.9).

The court then considered "Y." It first held that *Oliver I* did not bar consideration on remand of the MFC Internet disclosures this Court declined to address on appeal. (JA511-14.) The district court then found PM USA's evidence of these 2002 and 2003 disclosures both authentic and admissible and addressed why they established that the MFC requirements at the heart of the Complaint were "publicly disclosed for FCA purposes either as administrative reports" or "through the news media." (JA515-17.) Citing *Schindler*, the court held that the online procurement documents containing the provisions were "administrative reports" because a "'report' [i]s 'something that gives information,' or a 'notification' … or '[a]n official or formal statement of facts or proceedings.'" (JA518 (quoting *Schindler*, 131 S. Ct. at 1891).) The court also held that the webpages qualified as disclosed "'from the news media'" under Supreme Court and other precedents. (*Ibid.*)

The court then turned to the issue *Oliver I* did not decide: whether pre-2008 Internet publication of the MFC provisions *and* the Iceland Memo, "together," constituted a "combination of X and Y … from which readers or listeners [could have] infer[red] Z, *i.e.*, the conclusion that fraud has been committed'" *as alleged*

18

*in relator's complaint*.  (JA522 (quoting *Quinn*, 14 F.3d at 654).)  The court first cited *Oliver I* for the proposition that PM USA's "'certifications with the 'most favored customer' requirements … can be inferred by the simple fact that [the Exchanges have] continued to purchase [PM USA]'s cigarette products'" since 2002.  (JA523 (quoting JA272).)  It then held that "together" the Iceland Memo and MFC provisions disclosed the "essential elements" of the transactions on which the Complaint is based (triggering the jurisdictional bar) because "a hypothetical government investigator aware of the price discrepancies and the MFC provisions would be 'alerted to … the likelihood'" of fraud as pled—namely, that the price disparities suggested the vendor was implicitly and "falsely certifying compliance with the relevant provisions."  (JA523 (citing *Settlemire*, 198 F.3d at 918).)

Regarding Oliver's renewed "original source" claim, (JA 525), the court found that Oliver's new declaration revealed that he "gained all of the information critical to his Complaint from other individuals," (JA526), and for that and other reasons did not qualify as an original source, (*id*.).  The court thus dismissed the case with prejudice.  (JA502, 528.)  This appeal followed.

## SUMMARY OF ARGUMENT

Oliver does not challenge the admissibility of the archived MFC terms from the Exchanges' 2002 and 2003 websites.  Nor does he appeal the district court's rejection of his law-of-the-case and mandate-rule arguments against PM USA's

second jurisdictional motion.  He thus "waives [his] right to challenge [those] rul-ing[s]."  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002).  And his merits arguments fail for three reasons.

*First*, the district court's jurisdictional dismissal properly applied controlling law to Oliver's Complaint.  Where (as here) the government does not intervene, the FCA prohibits a relator from proceeding with "an action" that is "based upon" el-ements in the public domain.  § 3730(e)(4)(A).  This disclosure inquiry turns on the nature of the "action," *id.*, and specifically "relator's allegations" in the opera-tive "complaint," *Rockwell*, 549 U.S. at 470, 473-74.  If they are "based upon" publicly disclosed elements, the "action" is barred.  *Id*. at 472.

Applying this test, the district court correctly held "that the Iceland Memo and the MFC provisions, together, are sufficient to trigger the public disclosure bar." (JA523.)  Oliver's primary argument otherwise is that these documents, even taken together, do not reveal certain pricing details or other evidence of "*fraudu-lent*" certifications and thus do not disclose that PM USA "*falsely* certified" its Ex-change sales.  (OBr. 24, 30-38.)  This argument fails because it divorces the juris-dictional inquiry from the "action" it is supposed to test.  Oliver's Complaint pleads none of the facts (regarding sales terms, customers, markets, or products) he says are missing from the Iceland Memo, nor any certifications beyond those his Complaint implies from the MFC provisions themselves.  (*See* JA21-24, ¶¶ 26-29,

31-35 (asserting fraud "based upon" the same kind of price disparity and identical MFC language disclosed, respectively, in the Iceland Memo and on the Exchanges' websites).)  These details are thus irrelevant to jurisdiction.  *See Rockwell*, 549 U.S. at 470, 473-74.  And Oliver's concession that they are necessary to show fraud, (OBr. 35-36), simply confirms that his Complaint is inadequately pled. (JA54-69 (detailing why the prices in the Complaint are *not* comparable on the record here)); *Iqbal*, 556 U.S. at 678.  Properly applying § 3730(e)(4)(A), the district court correctly identified the "essential elements"—"X" and "Y"—upon which Oliver's (deficient) Complaint is "based."

*Second*, the district court correctly held that the "X" and "Y" were publicly disclosed through FCA-approved channels, namely:  a "civil … hearing," "administrative … report," and "the news media."  § 3730(e)(4)(A).  The Iceland Memo was "'actually made public'" pursuant to a court order and thus disclosed in a civil hearing, (JA237 (quoting *Quinn*, 14 F.3d at 652-53)), and was also disclosed in the "news media," which includes the type of reliable, "readily accessible websites" at issue here, (JA 520 (quotation marks and citation omitted)).  The MFC provisions were published on the Exchanges' official websites in 2002 and 2003 and were thus disclosed in administrative reports and news media before Oliver filed suit. (JA519-20.)  The district court correctly held that these disclosures "together" triggered the bar.

*Third*, the district court correctly held that Oliver is not an "original source." His claim to such status is not properly pled. And regardless, his declaration rests on details outside the timeframe relevant to the bar (because he did not discover them *before* filing suit) and insufficient to establish "'direct and independent knowledge of the information on which [his] allegations are based.'" *Quinn*, 14 F.3d at 656 (quoting § 3730(e)(4)(A)). The declaration merely shows that: (i) Oliver obtained certain details regarding PM USA sales from third parties; and (ii) his claim that PM USA's pricing practices constituted fraud is based on his interpretation of the Exchanges' MFC provisions and another public document (the Master Settlement Agreement). His "conclusory statement[s]" otherwise, (OBr. 59-60), do "not suffice" to establish original-source status, *Findley*, 105 F.3d at 688; *U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 35 (D.D.C. 2012). Accordingly, the Court should affirm the judgment.

## STANDARD OF REVIEW

This Court reviews jurisdictional dismissals *de novo*. (OBr. 28.) But Oliver errs in asserting that "'[a] complaint may be dismissed for lack of subject matter jurisdiction only if 'it appears beyond doubt that the plaintiff can prove no set of facts'" that "'would entitle him to relief.'" (*Id.* (quoting *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003), *judgment vacated*, 542 U.S. 155 (2004)).) This "no set of facts" language comes from *Conley v. Gib-*

*son*, 355 U.S. 41 (1957), which the Supreme Court abrogated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007).  Following *Twombly*, a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In applying this standard the Court cannot rely on "threadbare recitals of elements" or "conclusory statements," *id.*, and may "affirm [the] judgment on any ground the record supports … and that [Oliver] had a 'fair opportunity' to address," *e.g.*, *Jones v. Bernanke*, 557 F.3d 670, 676 (D.C. Cir. 2009) (citation omitted).

## ARGUMENT

**I.     THE ICELAND MEMO AND MFC TERMS TOGETHER DISCLOSE THE "ESSENTIAL ELEMENTS" OF THE ALLEGEDLY FRAUDU-LENT TRANSACTIONS ON WHICH THIS "ACTION" "IS BASED."**

The primary question in this appeal is the one this Court reserved in *Oliver I*: whether public disclosure of *both* the Iceland Memo and the Exchanges' MFC provisions trigger the jurisdictional bar by revealing the "essential elements" of the fraudulent transactions upon which Oliver's Complaint is "based."  (JA522.)  The district court held that the answer is yes.  (JA523-24.)  That was correct because where, as here, the U.S. declines intervention, a *qui tam* suit is jurisdictionally barred if the "essential elements" of "*relator's allegations*" are "based upon"— meaning "substantially similar to"—elements already in the public domain. (JA48-49 (quoting *Settlemire*, 198 F.3d at 918).)  The statute provides:

> No court shall have jurisdiction over *an action* under this section *based upon* the public disclosure of allegations *or transactions* [1] in a criminal, civil or administrative hearing, [2] in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or [3] from the news media, unless … the person bringing the action is an original source.

§ 3730(e)(4)(A).

As detailed below, Oliver's claim that PM USA falsely certified compliance with MFC conditions on its Exchange sales is "based upon" the same type of price disparity disclosed in the Iceland Memo and on the identical MFC language disclosed on the Exchanges' websites in 2002 and 2003. That is enough to trigger the bar, especially because Oliver admits these elements prompted him to "investigat[e]" and alert the government to the contracting fraud he asserts. (JA449-52, ¶¶ 5-7; OBr. 5, 15, 55-57.) The only portion of that "investigation" that matters for FCA purposes (the portion that occurred before Oliver filed suit) did not reveal any non-public evidence that Oliver pleads in the Complaint. Nor did it prompt intervention by the government, which Oliver admits still contracts with PM USA. (OBr. 14, 38.) Accordingly, the record here reveals a Complaint that places a conclusory fraud label on transactions whose essential elements were already public, and that Oliver concedes were sufficient to prompt both "investigation," (OBr. 57), and government "report[ing]," (OBr. 15), but did not result in intervention, contract suspension, or any non-public facts that support his claims.

Oliver's contrary arguments fail. Emphasizing that the disclosure bar "'prohibits *qui tam* actions only when either the *allegation of fraud* or the critical elements of the *fraudulent transaction* themselves' were publicly disclosed," (OBr. 30 (quoting *Quinn*, 14 F.3d at 654)), Oliver contends that the bar does not apply because even the Iceland Memo and MFC provisions combined do not reveal the allegedly "*fraudulent*" nature of PM USA's MFC certifications, (OBr. 33-38). These arguments turn the law on its head by divorcing the jurisdictional bar from the "action" it exists to test.

The PM USA pricing details Oliver says are not covered by the public disclosures here, (OBr. 35-36), are also not in his Complaint. They are thus irrelevant to the bar, and Oliver's assertion that they are necessary to show fraud underscores why his case independently merits dismissal under Rule 12(b)(6). The Complaint asserts "fraudulent certifications," but the only *factual* allegations it offers concern the same type of price disparity revealed in the Iceland Memo and the existence of MFC requirements with which PM USA implicitly certified compliance. (JA20-24 ¶¶ 20-24, 29-36.) The Complaint does not identify (much less adequately plead) any express certification of PM USA's supposedly false MFC compliance that could be publicly disclosed apart from the provisions the Complaint quotes and were published on the Exchanges' websites. Nor does it plead the pricing details Oliver says are missing from the Iceland Memo. Focusing the jurisdictional in-

quiry on the Complaint *as pled*—which is what the FCA requires—the district court correctly identified the "X" and "Y" here.

### A.    Oliver Misstates the Controlling Jurisdictional Test.

As noted, the FCA's jurisdictional bar applies to *qui tam* "actions"—as defined by relator's allegations in the operative complaint—that are "based upon" "transactions" whose "essential elements" were publicly disclosed through one of the statute's enumerated channels.  The "essential" elements of a fraudulent "transaction" are the facts that would allow a reader to "*infer* … that fraud has been committed" "as Relator allege[s] it in his complaint."  *Quinn*, 14 F.3d at 654; *U.S. ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 88 (D.C. Cir. 2014); § 3730(e)(4)(A); *Rockwell*, 549 U.S. at 460.  That makes sense because the disclosure bar is a jurisdictional test, not a bellwether for pleading some Platonic ideal of fraud.  If the essential elements underlying "*relator's allegations*" were public prior to suit, *Rockwell*, 549 U.S. at 473, the case falls outside the "'golden mean'" the FCA strikes "'between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own,'" *Graham*, 559 U.S. at 294 (quoting *Quinn*, 14 F.3d at 649).  The disclosure bar's focus on "relator's allegations," *Rockwell*, 549 U.S. at 473, disposes of Oliver's main argument on appeal.

26

### 1. Oliver's Pricing Arguments Are Irrelevant to Jurisdiction, but Confirm the Complaint Is Inadequately Pled.

Oliver's focus on whether "[t]he district court incorrectly concluded that PM USA's *fraud* was disclosed," (OBr. 37), is a red herring. "There is no requirement … that the relevant public disclosures irrefutably prove a case of fraud." *Settlemire*, 198 F.3d at 919. As noted, the disclosure bar applies "where it is possible to say that the evidence and information in the possession of the United States at the time the [FCA] suit was brought was sufficient to enable it *adequately to investigate*" the relator's allegations of fraud. *Quinn*, 14 F.3d at 654 (quotation marks omitted). Oliver says the disclosures here fail this test. (OBr. 29.) In support, he relies on *Oliver I*'s observation that the "X" in this case "was knowledge that 'Philip Morris was not providing the Exchanges with the best price for cigarettes'" and "Y" was "the fact that PM USA had '*falsely* certified' or made '*false* certifications of compliance' with the Exchanges' MFC requirements." (OBr. 33 (emphasis original) (quoting JA325).) He then says that even the publicly-disclosed "combination" of the Iceland Memo and MFC provisions does not trigger the bar because it does not reveal pricing and other details "from which [one] may infer … the conclusion that *fraud* has been committed." (OBr. 35-38 (alterations original) (quotation marks omitted); *see also* OBr. 32 (arguing that the new record cures only one of the disclosure defects *Oliver I* identified in stating that "*[n]either* the contract term obligating Philip Morris to provide the government with MFC pricing

27

*nor* Philip Morris's fraudulent certifications that it complied was publicly disclosed" (emphasis original)).)

Oliver misses the mark in arguing that the Iceland Memo does not reveal information that would signal an MFC violation, much less a fraud.  (OBr. 34-36) (arguing that the Memo lacks pricing details sufficient to assess MFC application, and provides "a reason … for the price differential" it discloses).  First, the "reason" the Iceland Memo provides for the price differential does not change the fact that the Memo discloses concerns over the differential for which an entity requested a "written justification" from PM USA.  (JA74.)  Second, the price details Oliver says are missing from the Iceland Memo are irrelevant to jurisdiction because the disclosure bar focuses on the "action"—and specifically "relator's allegations." *Rockwell*, 549 U.S. at 473.  Accordingly, the sales details Oliver describes are important only if they are in the Complaint.  They are not.

The Complaint's passing references to unspecified sales involving unnamed customers, (JA21-22, ¶¶ 25-29), are "threadbare," *Iqbal*, 556 U.S. at 678; (*see* JA54-69, 245-53; OBr. 18-20 (citing JA21-22, 24, ¶¶ 25-26, 28, 38)).  And the few pricing details it provides (i) reveal the same (military-versus-duty-free) price disparity the Iceland Memo identifies, and (ii) do not explain the comparability of the relevant sales, customers, or markets.  (OBr. 18-20, 34-35; JA18-22.)  The Complaint simply compares the *military* prices at which *PM USA* allegedly sold ciga-

rettes to the *Navy Exchange* in *Guam* with the prices *PM USA affiliates* sold *to civilian duty-free* customers in *American Samoa*. (OBr. 18-20; JA21, ¶¶ 25-26.)

| **COMPLAINT ¶¶ 25-29, 31-35** | |
|---|---|
| **PM USA**<br>↓<br>**NAVY EXCHANGE GUAM**<br>**[$23.77/carton]** | **PM USA**<br>↓<br>**CORPORATE AFFILIATES**<br>**(PMI or PM DUTY FREE)**<br>↓<br>**CIVILIAN DUTY FREE BUYERS AMERICAN SAMOA**<br>**[$13.83/carton]** |

The Iceland Memo at least compares prices in the same geographic market.

| **ICELAND MEMO** | |
|---|---|
| **PM USA**<br>↓<br>**NAVY WAREHOUSE ICELAND**<br>**[$ PM USA Military tax-free price]** | **PM USA**<br>↓<br>**CORPORATE AFFILIATE**<br>**PMI Duty Free Sales**<br>↓<br>**CIVILIAN DUTY FREE (BELKOV) ICELAND**<br>**[$ PMI Duty-Free List Price: "lower than PM USA Military tax-free" and "substantial price advantage over the Navy Exchange"]** |



PM USA agrees with Oliver that the apples-to-oranges comparison in his Complaint is not enough to show a MFC violation, much less fraud.[5]  PM USA (and the district court) disagree with Oliver that he can turn this pleading "weakness" into a jurisdictional "strength," *Graham*, 559 U.S. at 291, by tying application of the jurisdictional bar to public disclosure of pricing details absent from the Complaint itself.  He cannot because the bar focuses on the nature of the "action," and specifically whether "relator's allegations" in the operative Complaint are "based upon" elements that are "substantially similar to" elements in the public domain.  § 3730(e)(4)(A); *Settlemire*, 198 F.3d at 918.  Here they are, and the bar is triggered, because the Complaint dictates what the public disclosures must reveal, not the other way around.  The Complaint's failure to allege how the price disparity it identifies involved sales to "the 'same or similar' [customers] or … 'like terms,'" (OBr. 35-36), means the public disclosures need not do so ei-

---

[5] Oliver does not dispute the facial differences between the Exchanges, which are government entities, and PM USA's corporate affiliates, which are not.  He simply argued below that "[t]here is nothing … in PM USA's MFC obligations that *exempts* sales to affiliates" or suggests these companies are different "in a way that renders [the Complaint] '*implausible*.'"  (JA192.)  That argument fails because it is not PM USA's burden to prove that Oliver's allegations are "implausible"—*Oliver* must plead facts that make his claims "plausible."  *Iqbal*, 556 U.S. at 679.

ther.[6]  That the Complaint is "based upon" price disparity and certification ele-
ments "substantially similar to" those in the Iceland Memo, *Settlemire*, 198 F.3d at
918, and identical to the MFC provisions, is enough to trigger the bar.[7]  The addi-
tional details Oliver describes as missing from the Iceland Memo, (OBr. 35-36),
simply confirm that the Complaint independently warrants dismissal for failing to
plead an MFC violation or the fraud,[8] materiality,[9] and scienter[10] required for FCA
liability, (JA48-69, 245-53).

---

[6] Oliver argues that the Iceland Memo "does [not] show that the two Philip Morris
entities … were not truly separate or that their inter-corporate transactions were
undertaken to circumvent PM USA's MFC obligations." (OBr. 35.)  But this is
merely a variant of his general complaint that the disclosures here do not contain
adequate sales information, which fails for the reasons above.

[7] These pleading failures are telling because they have persisted over three com-
plaints and because the SEC filings PM USA introduced below, (JA81-148), show
that PM USA's sales to the only two corporate affiliates (PMI and PM Duty Free)
the Complaint identifies, (OBr. 18; JA21, ¶ 25), were *not* "comparable" to Ex-
change sales in any respect relevant to MFC compliance, (OBr. 18; JA21, ¶ 26);
*see Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222, 1226 n.6
(D.C. Cir. 1993) (court may notice public material in deciding motion to dismiss).

[8] The Complaint's conclusory allegations, (*see* JA61-64, 194-200, 245-50), "fail[]
to identify with specificity who precisely was involved in the fraudulent activity"
or "the role the[y] played."  *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389
F.3d 1251, 1257 (D.C. Cir. 2004).  *Compare U.S. ex rel. Heath v. AT & T, Inc.*,
791 F.3d 112, 124 (D.C. Cir. 2015) (allowing auditor-relator's claim to proceed
against a corporation because the claim was based on an audit report and official
corporate policies and documents from the defendant evidencing the allegedly
fraudulent overbilling; Oliver pleads no such evidence here).

There is nothing "inconsistent" about this conclusion. (OBr. 39.) As the district court recognized, PM USA's jurisdictional and 12(b)(6) "positions are not irreconcilable because … the legal standard for pleading fraud is different than the standard for public disclosure." (JA524 n.10.) "The disclosure bar applies where 'it is possible to say that the evidence and information in the possession of the United States at the time the [FCA] suit was brought was sufficient to enable it *adequately to investigate* the case and to make a decision whether to prosecute.'" (JA478 (emphasis original) (quoting *Quinn*, 14 F.3d at 654).) "In contrast, the standard for pleading fraud requires more than the basis for an investigation because a plaintiff cannot proceed to discovery until he has stated a claim under Rules 8 and 9(b)." (*Id.*) As Oliver concedes, that requires pleading (i) sales that involved comparable products, terms, conditions, customers, and markets, (*e.g.*,

---

[9] Oliver fails adequately to plead that the misrepresentations he alleges were "material to" the government's decision to pay the *particular* (and to this day unidentified, (JA23-24, ¶¶ 33, 37)), claims for which he seeks FCA damages. *Compare SAIC*, 626 F.3d at 1271 (finding materiality only after government pled that it would not have awarded the contracts had it known of relator's fraud).

[10] Oliver likewise fails to plead facts supporting his conclusory statement that PM USA "knowingly charged … prices for its cigarette products that violated the '[MFC]' warranties." (JA20, ¶ 24); *see SAIC*, 626 F.3d at 1271. That failure vitiates his fraud claim because he admits the price disparity he describes could comport with the MFC provisions. (OBr. 36.)

32

OBr. 18, 34), and (ii) all other elements required to demonstrate procurement fraud, *see supra* nn.8-11.[11]

### 2. Oliver's "Fraudulent Certification" Arguments Also Do Not Avoid the Jurisdictional Bar.

Oliver attempts to bolster his misplaced pricing arguments by insisting that the jurisdictional bar requires the combined disclosures here to reveal "fraudulent certifications" separate from the MFC provisions themselves. (OBr. 3, 13.) Looking to the Complaint, as the FCA requires, again disposes of Oliver's argument because it shows that this "action" is not "based upon" certifications separate from the MFC provisions.

The Complaint implies PM USA's allegedly "fraudulent certifications" of MFC compliance from the MFC terms themselves, (JA20-24 ¶¶ 20-24, 29-36), and "[n]owhere" adequately pleads "that Defendant expressly certified compliance with the [provisions]," (JA524 (citing Fed. R. Civ. P. 9(b)); *see* JA15-24).[12] Oliver does not challenge this ruling or attempt to identify any express certifications, presumably because circuit law currently allows a relator to "infer[]" certifications

---

[11] Oliver errs in contending that PM USA did not seek dismissal based on Rule 9(b). (OBr. 38-39.) The PM USA brief Oliver cites for this assertion expressly cited Rule 9(b) in both headings and text. (JA 245.) So too PM USA's first dismissal motion, (JA 54-69), as Oliver knows because his opposition dedicated an entire section to Rule 9(b), (JA 194-200).

[12] Oliver's passing references to "purchase orders," (*e.g.*, JA20, ¶ 22), do not contain "*Philip Morris*" certifications because such orders (*i.e.*, orders seeking to "purchase" product) are issued by the government, *not* PM USA.

from federal contracting requirements.  (JA287-88); *Heath*, 791 F.3d at 124 (recognizing "'implied' certifications" where a relator adequately pleads facts—there, official internal corporate documents and audit results—suggesting "the defendant [may have] knowingly 'withheld information about its noncompliance with material contractual requirements'" (quoting *SAIC*, 626 F.3d at 1269)); *Davis*, 793 F.3d at 124 ("[C]ourts infer implied certifications from silence when a claimant fails to comply with obligations that are a prerequisite to the government action sought" (citation and quotation marks omitted)).

In circuits that recognize the "implied certification" theory of FCA liability, relators like Oliver are free to plead it—but their allegations remain subject to disclosure-bar dismissal.  The bar applies if the fraud "*as Relator allege[s] [it] in his complaint*" is "based upon" elements already in the public domain.  *Staples*, 773 F.3d at 88.  Where that is the case, as it is here, "Relator has … pled himself out of court" because his "suit is 'based upon' publicly disclosed 'allegations or transactions.'" *Id.* (quoting § 3730(e)(4)(A)).

This is as true for Oliver, a self-styled "tobacco company insider," (OBr. 7), as it was for the "self-styled pencil-industry insider" in *Staples*, 773 F.3d at 85.  Oliver's claims of fraud are "based upon" "transactions" whose "essential elements" are "substantially similar" to those publicly disclosed years before he filed suit:  the price disparity discussed above and disclosed in the Iceland Memo and

implied certifications "based upon" the public MFC provisions. Abiding the FCA and applying the disclosure-bar inquiry to Oliver's certification claims *as pleaded* confirms the district court's conclusion that "the Iceland Memo and the MFC provisions, together, are sufficient to trigger the public disclosure bar." (JA 523.)

Oliver's remaining responses are meritless. Citing *Oliver I*'s statement that "the Iceland Memo did not publicly disclose the allegedly *fraudulent* aspect of the prices Philip Morris charged the Exchange[s]," (OBr. 31-32 (quoting JA292)), Oliver contends that the district court's ruling improperly "transform[s]" the Iceland Memo into a disclosure this Court already rejected, (OBr. 29). This argument fails because the quoted statement addressed only whether "the Iceland Memo, *standing alone*," contained both the "X" and "Y" required to trigger the bar. (JA291.) The current record and judgment rest on public disclosure of *both* the Iceland Memo *and* the MFC provisions, (JA523), and thus link the bar to the "elements" of this "action" on grounds *Oliver I* did not decide.

Oliver's argument about the timing of the Iceland Memo is likewise a red herring. (OBr. 35 (arguing that the Memo "does [not] show that the price discrepancy it describes occurred 'during the same [time] period'" as the events in his Complaint).) First, the timing issue Oliver raises is a function of the procedural limits on his suit, *not* of any substantive difference between the pricing practices revealed in the Iceland Memo and his Complaint, which alleges violations begin-

ning in 2002 because anything earlier would be barred by the statute's six-year limitations period. § 3731(b)(1). Second, and regardless, "where the general practice" constituting an alleged fraud "has already been publicly disclosed," a relator's "ability to reveal" later or additional "specific instances" is "insufficient to prevent operation of the jurisdictional bar." *Settlemire*, 198 F.3d at 919; *Quinn*, 14 F.3d at 655. That is the case here. (OBr. 18-20 (describing the Complaint's challenge to a general practice—disparate military-versus-affiliate/duty-free pricing—that the Iceland Memo documents as early as 1999)); *see Findley*, 105 F.3d at 688; *Settlemire*, 198 F.3d at 918-19.

## B.    The District Court Correctly Identified "X" and "Y."

The fraudulent "transactions" Oliver alleges are cigarette sales transactions that he says PM USA "falsely certified" as complying with the Exchanges' MFC requirements. (OBr. 20, 32-33; JA23-24, ¶¶ 33, 37.) Applying the disclosure-bar analysis above, the district court correctly held that the "essential elements" of these transactions "as Relator allege[s] [them] in his complaint," *Staples*, 773 F.3d at 88, are: (X) a disparity between the price PM USA charged the Exchanges for certain cigarettes and the price it charged others (corporate affiliates or their buyers) for allegedly the same product, (JA21-23, ¶¶ 25-27, 30); and (Y) the certifications "implicit" in the Exchanges' MFC requirements that the price disparity allegedly rendered false, (JA23-24, ¶¶ 32-33, 35-37); *SAIC*, 626 F.3d at 1266.

36

**The District Court Correctly Identified "X."**  The Iceland Memo discloses the pricing disparity at the heart of Oliver's Complaint—the "X" in the "essential elements" equation he describes.  (OBr. 30.)  The Memo states in relevant part: "PMI Duty-Free list prices are lower than PM USA Military tax-free prices." (JA74.)  The Complaint rests on the same "price differential" between PMI duty-free pricing and PM USA military pricing.  (OBr. 18-19 (quoting JA21-22, ¶¶ 25-29).)  *Oliver I* thus correctly stated that "the pricing disparities" Oliver alleges comprise "X."  (JA287; *see* JA270, 498 (Tatel, J.) ("We've got the X—that's in the memo," which discloses "the same disparate pricing allegation on which Oliver's Complaint is premised.").)  Nothing has changed.

**The District Court Also Correctly Identified "Y."**  Because his Complaint pleads (and circuit law currently recognizes) an implied-certification theory of FCA liability, *see supra* Part I.A.2, Oliver errs in arguing that "the 'Y' factor" in the disclosure bar analysis goes beyond the MFC provisions themselves, (OBr. 33). Applying the bar inquiry to the "action" and "allegations" here, the "Y" element is synonymous with the provisions because Oliver asserts that PM USA's allegedly false MFC certifications "can be inferred by the simple fact that [the Exchanges] continued to purchase Defendant's cigarette[s]'" during the period in suit.  (JA523 (quoting JA272).)

37

*Oliver I* recognized as much, but vacated the first dismissal because it concluded that the record then before this Court did not establish Internet disclosure of the MFC provisions to the "broader public" before 2008. (JA287-88, 292.) That is no longer the case. Even assuming proof of Internet disclosure was required to trigger the bar, the district court found, and Oliver concedes, such disclosures occurred years before he filed this suit. (OBr. 29; JA514-22.) Accordingly, the disclosure inquiry is simply whether the Complaint's fraud allegations are "based upon" a certification element "substantially similar to" the disclosed provisions.

The answer is yes. Oliver concedes that "X"—the price disparity he alleges—was disclosed in the Iceland Memo. (OBr. 32.) And he concedes that his Complaint is "based upon" the MFC provisions ("Y") that were a condition of PM USA's Exchange contracts and disclosed on the Exchanges' websites before sued. (OBr. 16-18; JA 18-19, ¶¶ 11, 14, 16-17, 19.) As the district court noted, "Oliver does not explain, and the Court cannot imagine, how an implied certification could be publicly disclosed." (JA525 n.11.) The district court thus correctly held that public disclosure of the Iceland Memo and MFC provisions "together" trigger the disclosure bar, (JA523), because Oliver's Complaint—which controls the jurisdictional inquiry—is "based upon" both, § 3730(e)(4)(A).[13]

---

[13] Circuit law and Oliver's own declaration confirm this. As *Staples* observes, the public disclosure "inquiry focuses not on [any] additional incriminating information a relator supplies, but instead on whether 'the quantum of information al-

## II.    THE MFC TERMS AND ICELAND MEMO WERE PUBLICLY DISCLOSED THROUGH FCA CHANNELS.

Given the flaws in his opening jurisdictional arguments, Oliver understandably devotes significant time to the fallback assertion that the disclosures above did not occur through FCA-prescribed channels.  Again, he is wrong.

### A.    The Iceland Memo Was Disclosed Through Two FCA Channels.

In his last appeal, Oliver stated that he was "not going to challenge the public disclosure channel [of the Iceland Memo] in this case" and specifically was "not challenging it as published within one of the channels allows by the statute." (JA496-97 (Tr. 9-10).)  On remand, he reversed course and argued that the Memo was not publicly disclosed for FCA purposes.  The district court disagreed and held that the Memo was publicly disclosed "as part of [a] civil case" and also "in the 'news media' given its availability online."  (JA267-69.)  Oliver seeks reversal on the grounds that, "absent filing [in court], there is no public disclosure" in a civil hearing, (OBr. 51), and that "the presence of the Iceland Memo in … 'Internet accessible' databases cannot properly be construed as constituting a public disclosure via the 'news media,'" (OBr. 54.)  Not so.

---

ready in the public sphere' was sufficient to 'set government investigators on the trail of fraud'" *relator* seeks to litigate in the government's name.  *Staples*, 773 F.3d at 88 (citation omitted).  The district court held this test satisfied here, (JA523-24), and Oliver's new declaration validates this in asserting that the mere fact of the price discrepancy and MFC requirements prompted him to "investigate" and alert the military to the fraud he (inadequately) alleges, (JA 455, ¶ 13; OBr. 15, 22-24).

### 1.   *The Iceland Memo Was Disclosed In a "Civil Hearing."*

Oliver's civil-hearing argument overreads this Court's observation that "[d]iscovery material, *when filed with the court* (and not subject to protective order), is 'public[ly] disclos[ed]' in a 'civil hearing' for purposes of § 3730(e)(4)(A)'s jurisdictional bar." *Quinn*, 14 F.3d at 652 (alterations in original). That court filings are *one* method of civil-hearing disclosure does not mean they are the *only* method. The Iceland Memo is an internal PM USA document that was reviewed by counsel, produced to the United States in civil litigation, and then published on a professionally-maintained website pursuant to a court order Oliver's brief simply ignores. *See United States v. Philip Morris, Inc.*, No. 1:99-CV-02496, Order #1015: Final Judgment and Remedial Order ¶¶ 8, 10(a)(1), 10(c) (D.D.C. Aug. 17, 2006). That suffices to constitute public disclosure in a civil hearing under circuit precedent Oliver neither refutes nor distinguishes.

*Quinn* (the only civil-hearing case Oliver cites) makes clear that civil-hearing disclosures do not turn on whether material is "filed" with a court *per se*, but on whether it was "*actually* made public" incident to a proceeding as distinct from merely being "*theoretically* available upon the public's request" because it was exchanged only "between two private litigants." *Quinn*, 14 F.3d at 652 (emphasis original); (JA267). This makes sense given the 1986 amendments, which replaced the disclosure bar's focus on documents in the Government's possession

40

(and thus only theoretically available to the public), with a focus on actual public availability through specified channels. *See Graham*, 559 U.S. at 294-95.

Oliver responds by arguing that actual public disclosure (even pursuant to court order) is not good enough where, as here, the document is actually available but locating it is like finding a "needle in a haystack." (OBr. 53.) Oliver cites no authority for this argument because there is none. The FCA imposes no conspicuousness requirement on public disclosures. That is evident from *Schindler*, which applied the bar to documents that an agency produced to a *single person* (the relator's wife) who knew *exactly* what to request because her husband (the relator) was a former employee of the defendant and was using FOIA to request documents (company reports on compliance with federal hiring policies) that would support his suit. *See* 131 S. Ct. at 1890. The Iceland Memo is far more available than the material in *Schindler* because it is the *first* document that appears from a free electronic search (using the terms "'philip morris' + duty-free + aafes + nexcom + navy," (JA79-80)) of the website the district court ordered in the course of the high-profile government litigation known to industry players like Oliver. Indeed, the court-ordered website made the document more accessible than it would have been if "filed with the court" in hard copy or even on PACER, which requires a subscription and password that the court-ordered database does not. (JA480.)

41

For all of these reasons, Oliver's "civil-hearing" argument is unavailing. And his last-ditch assertion—that "a document produced in discovery" is not publicly disclosed because it "has later been made publicly available through some channel *not* recognized by the FCA," (OBr. 52)—is circular and meritless. The Iceland Memo was "produced in discovery" during civil litigation, (*id*.), but that is *not* why the district court held it publicly disclosed. It concluded there was disclosure in a "civil hearing" because the Memo was actually made public pursuant to a court order in civil litigation. That holding accords with circuit law and the record here, *see Quinn*, 14 F.3d at 652-53, and Oliver cites no authority otherwise.

## 2. *The Iceland Memo Was Also Disclosed in the News Media.*

The district court also held that the Iceland Memo "qualifies as publicly disclosed in the 'news media' given its availability online." (JA268.) Oliver's primary response is that "'Internet accessibility' should not, *without more*, trump Congress's careful delineation of the specific 'jurisdiction stripping' channels identified in the FCA." (OBr. 55.) This argument misstates the district court's opinion and conflicts with controlling law.

The district court did *not* hold that Internet accessibility *alone* constituted "news media" disclosure of either the Iceland Memo or the MFC requirements. (JA268-69, 520-22.) It held that court-ordered disclosure of the Iceland Memo on a dedicated website and online university archive were enough because both sites

were reliable, professionally-maintained channels for announcing information to the public. (JA268-69, 480.) And it held that the MFC terms' publication in official procurement documents on agency websites was likewise a reliable channel for announcing information to the public. (JA481-84.) These rulings were correct.

Oliver contends that the district court's "news media" rulings seize on the broad definition of "media" as "a channel, method, or system of communication, information, or entertainment," *Webster's Third New Int'l Dictionary* 1401-03 (1986), but "disregard[]" its modification by the word "news," (OBr. 46), which he says applies only to channels "involv[ing] the use of editorial discretion and the regular publication and dissemination of information," (OBr. 45). This argument is belied by the authorities in his own brief, which boil down to two inapposite cases: *National Security Archive v. Department of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), and *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F. Supp. 416 (D. Del. 2014). (OBr. 44-46.)

*Archive*—Oliver's only source for arguing that "news media" disclosures must involve "editorial discretion"— does not address the FCA or Internet publication of any kind. This 1989 opinion addresses whether the Archive (a non-governmental body) qualified for the preferential pricing on FOIA requests Congress extended to "representatives of the news media." 880 F.2d at 1382, 1384-87. To the extent this opinion has any relevance here, it supports the district court's

43

decision because it tied its definition of "representatives of the news media" to the *people* eligible for the FOIA discount in issue. *See id.* In contrast, the FCA uses the term "news media" to describe a "channel" of disclosure. Thus, the FCA supports the district court's conclusion that, in the context of § 3730, when modified by the word "news"—i.e., "a report of a recent event," *Webster's* 1524—"news media" refers to any "channel, method, or system of communication" through which "a report of a recent event" may be transmitted, *id.* at 1401-03, 1524.

*Moore* similarly accords with the district court's decision. *Moore* is an FCA case, but does not aid Oliver because it excluded from the FCA's definition of "news media" private blog posts that expressly "*disclaime[d]*" *reliability* in declaring that they were *not* "edited, fact-checked or screened." 69 F. Supp. at 425. Based on these undisputed facts, the court held that the posts "amount[] to nothing more than vague allegations in an informal forum discussion *without any indicia of reliability or substantiation*." *Id.* The opposite is true here. The Iceland Memo was published online only after review by PM USA's counsel, production to the government in civil litigation, and posting per a court order and consent decree enforceable by contempt. (JA51-52, 241, 267-68.)

The district court's finding of news media disclosure under these particular circumstances was entirely proper, especially given the channel's "broad[] sweep." *Graham*, 559 U.S. at 290. Oliver's initial decision not to contest this disclosure

made sense, and his current argument that affirming the judgment will broaden the "news media" category to the point of distorting the statute, (OBr. 44-49), is meritless. Affirming the district court's application of "news media" to the record here would *not* sweep in "*all privately generated information that is accessible on the Internet.*" (OBr. 48.) It would simply accord with the many cases holding that reliable content published to searchable, professionally-maintained public websites (here per court order) fall well within the "generally broad scope of the FCA's public disclosure bar" as described in *Graham*, 559 U.S. at 290, and *Schindler*, 131 S. Ct at 1891.

Oliver is likewise wrong that affirming the district court's "news media" holding would render the statute's other prongs "superfluous," (OBr. 48), as evidenced by the district court's distinct rationales for applying different prongs on the specific record here, (JA517-22). The mere fact that the prongs overlap is natural. As the Supreme Court explained, the "sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides a 'broad sweep,'" and the provision's plain language "reflect[s]" Congress's "intent to *avoid underinclusiveness even at the risk of redundancy*." *Schindler*, 131 S. Ct. at 1891.

The Iceland Memo was first published "online in a public, searchable database pursuant to a settlement agreement and subsequent court order" and later "re-

post[ed]" to an equally "text-searchable university database available to the general public."  (JA520 (quotations omitted).)  Both the sites and their content are reliable means of announcing information to the public, and thus qualify as "news media" channels under FCA precedents.

This conclusion would not extend the disclosure bar to "all materials in public libraries."  (OBr. 54.)  Setting aside that a public-disclosure ruling alone would not confer the "expansive and uncontrolled immunity" Oliver describes, (OBr. 54), the district court's decision does *not* treat the Internet—the "digital equivalent" of the "public library," (*id*.)—as "news media."  It simply recognizes that certain websites that announce content with sufficient reliability fall within this "broad" statutory channel.  In so doing, it treats certain Internet content as publicly disclosed for FCA purposes, just as it would certain materials (government reports, court filings, *New York Times* articles) available in a public library.  In sum, the district court correctly held that the Iceland Memo was publicly disclosed for FCA purposes, *Oliver I* did not disturb this conclusion, and Oliver provides no reason to do so now.

### B.    The MFC Provisions Were Disclosed Through "Administrative Reports" and the "News Media."

Oliver concedes that "PM USA has now shown that the Exchanges' MFC provisions were posted on the Internet" before January 2008.  (OBr. 29; *see also* JA344-95 (documenting publication on the Exchanges' websites since August

46

2002 (Navy) and July 2003 (Army)).)   Oliver nonetheless challenges the district court's holding that the MFC requirements were disclosed as "administrative reports" and through the "news media."  (JA517-22.)   He is wrong.

### 1.     The MFC Terms Were Disclosed in "Administrative Reports."

An FCA disclosure may be made through "congressional, administrative, or [GAO] report[s]."  § 3730(e)(4)(A).  "[T]here is no dispute that the webpages [containing the MFC terms] are 'administrative':  both [Exchanges] are agencies within the U.S. Department of Defense."  (JA519.)   And Oliver's argument that Internet publication of the provisions was not part of a "report," (OBr. 42), conflicts with the statute and Supreme Court precedent.

"The seminal case on the meaning of the term 'report' for FCA purposes is *Schindler*," which states that a "report" is "'something that gives information' or a 'notification' … or '[a]n official or formal statement of facts or proceedings.'" (JA518 (alteration in original) (quoting 131 S. Ct. at 1891 (further defining report as an "announcement that is prepared, presented, or delivered, usually in formal or organized form")).)   Noting that this "ordinary meaning of 'report' is consistent with the generally broad scope of the FCA's public disclosure bar," *Schindler* held that an agency response to a FOIA request was a report because it "gives information'" by "notif[ying] the person making [the] request of [the agency's] determination and the reasons therefor."  131 S. Ct. at 1893.

47

So too here.  As the district court held, the documents on the Exchanges' websites were "reports" because they "clearly 'give information'" to the "public, including potential government contractors," regarding the terms "on which [the Exchanges] do business."  (JA519 (quoting *Schindler*, 131 S. Ct. at 1891).)  Oliver responds by arguing that the MFC provisions here are unlike the *Schindler* report because they are not the result of agency work product.  (OBr. 42-43.)  Not so. The procurement guides containing the MFC terms qualify as "reports" even under the narrow definition ("synthesis of information in an investigatory context") "squarely rejected" in *Schindler*.  (JA519); *see* 131 S. Ct. at 1895-96 (overruling decision that "'report' must be read to 'reflect … situations in which the government … has completed[] some focused inquiry or analysis'" (citation omitted)).

Oliver nonetheless insists that it is "tautological" to say that the Exchanges' MFC terms "give information" about the terms because "they *are* the Exchanges' terms."  (OBr. 42 (emphasis original).)  Again Oliver attacks a straw man.  The "reports" the district court credited were the "archived online [procurement] document[s]" published on the Exchanges' websites in 2002 and 2003, (JA515), and the MFC provisions were part of this report—and cannot be "disaggregated" from it—under *Schindler*.  131 S. Ct. at 1893.

This conclusion would *not* "mean[] that any document available for public review in any government office or on any government website is an 'administra-

tive report,' regardless of the actual nature of the document." (OBr. 44). As the district court emphasized, the "Publication 61" and "Terms and Conditions" documents on the Exchanges' official websites "inform the public, including potential government contractors, of the terms and conditions on which [the Exchanges] do business." (JA519.) That is not true of "any" government document. It is a hallmark of the documents here, which constitute exactly the type of "notification[s]" and "announcement[s]," *Schindler*, 131 S. Ct. at 1891, that qualify as FCA "administrative … report[s]." § 3730(e)(4)(A).

### 2.  *The MFC Provisions Were Also Disclosed in the "News Media."*

The district court also held that the Exchange webpages containing the MFC terms qualified as "news media" because, in addition to being "readily accessible to the public," *e.g.*, *Staples*, 773 F.3d at 85, "the purpose of those pages was clearly to give the public an accurate account of those entities' contracting requirements," (JA519, 521). That holding was correct.

"The 'news media' referenced in [the public-disclosure bar] plainly have a broa[d] sweep." *Graham*, 559 U.S. at 290. And numerous circuits agree that this disclosure channel encompasses online disclosures of the type at issue here. For example, *Staples* affirmed dismissal of a *qui tam* action because it was based on U.S. Customs information "publicly disclosed in [a commercial Internet] database" that was "readily accessible to the public." 773 F.3d at 85, 86-87. The Eleventh

49

Circuit likewise recently declared that information on "publicly available websites" that are "intended to disseminate information" are "news media for [FCA] purposes." *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 813-14 (11th Cir. 2015) (holding that health clinic websites advertising free patient services publicly disclosed the essential elements of alleged Medicare fraud). The Eighth Circuit recently concluded that hearing testimony published on a state utility commission website was disclosed via the "news media." *U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014). And the Fifth Circuit has long treated "news media" as encompassing reliable Internet sites. *U.S. ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008).

Oliver ignores these appellate precedents and the many district court decisions cited below. (OBr. 44-48.) Instead, he bases his appeal on the two inapposite decisions—*Archive* and *Moore*—discussed above. But these FOIA and private-blog cases have no relevance to the MFC disclosures here, which utilized official Exchange websites to announce an "accurate account of those entities' contracting requirements." (JA521.) Oliver does not explain how publication of such official information on agency websites is analogous to "an informal" and expressly unreliable "forum discussion" on a private blog—because it is not. And his statutory and overbreadth arguments are unavailing for the reasons noted, particularly because his baseless concern that affirmance would sweep "all *privately gen-*

*erated* [Internet] information" into the public-disclosure bar, (OBr. 48), makes no sense with respect to the official *government* disclosures here.

<p style="text-align:center">*     *     *     *     *</p>

For the foregoing reasons, the Court should affirm the district court's holding that on the current record, the Iceland Memo's court-ordered Internet publication constituted disclosure through a "civil hearing"; the MFC terms' publication in official procurement guides on agency websites constituted disclosure through "administrative reports"; and on the specific record here, these reliable online publications also constitute disclosures in the "news media."

## III.   THE DISTRICT COURT PROPERLY REJECTED OLIVER'S NEW "ORIGINAL SOURCE" CONTENTIONS.

Evidently concerned that the public-disclosure bar applies here, Oliver insists he can avoid it on "original source" grounds.  (OBr. 55-60.)  In 2013, the district court held that Oliver was not an original source because he "failed to show that he has 'direct' knowledge—*i.e.*, first-hand knowledge"—of the "alleged price differentials or of [PM USA's] participation in, or awareness of the alleged fraudulent violations of the [MFC] provisions."  (JA274 (quotation marks omitted).)  *Oliver I* did not disturb that holding.  Nonetheless, Oliver relied on this Court's vacatur to submit a new declaration, (JA448-60), and reassert original-source status.  Again the district court rejected this claim.  This Court should affirm.

### A.     Oliver's Original-Source Allegations Are Unpled and Untimely.

Oliver's original-source claim fails regardless of his new declaration because the Complaint omits the original-source allegations that appeared in his two prior complaints.  (JA15-28, 242; *see* Dkt. 1, Compl. ¶ 2; Dkt. 8, Am. Compl. ¶ 3.)  The FCA requires relators who claim original-source status to *plead* in their *operative complaint* that they had "direct and independent knowledge of the information on which [their] allegations are based *and* [that they] voluntarily provided the information to the Government *before* filing [suit]."  *Rockwell*, 549 U.S. at 467 (quoting § 3730(e)(4)(B) and explaining, *id.* at 473, that a relator would otherwise be "free to plead a trivial theory of fraud for which he had some direct and independent knowledge and later amend the complaint to include theories copied from the public domain or from materials in the Government's possession").  Here, as in *Rockwell*, "[plaintiff's] allegations changed during the course of the litigation," so the Court must "look to the amended complaint to determine jurisdiction."  *Id.* at 473-74.  And here, as in *Rockwell*, Oliver "plead[ed] away jurisdiction through amendment[s]" that abandoned any original-source allegations.  *Id.* at 474 n.6.  The Court should affirm the district court's original-source ruling for that reason alone.  *See U.S. ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 606 (7th Cir. 2005) (affirming dismissal where relator "did not allege that he was an

original source"); *Bernanke*, 557 F.3d at 676 (the Court "may affirm … on any ground the record supports").

Further, even if Oliver's latest declaration could be treated as an amended complaint (it cannot), its allegations are conclusory and untimely.  To plead original-source status, Oliver must allege facts connecting the allegedly improper "surcharges" he describes with the inflated Exchange pricing Oliver says PM USA falsely certified as complying with its MFC obligations.  His new declaration fails to do that.  It simply asserts that "[b]ased on my investigation, *I concluded* that PM and other cigarette manufacturers were … failing to adjust their prices to the military exchanges to reflect the inapplicability of the … surcharges," and thus that they were "selling their cigarette products to [the Exchanges] at higher prices than … to similarly situated civilian customers overseas."  (JA453, ¶ 9.)  This is a classic "conclusory statement[]" that will "not suffice" for FCA jurisdiction.  *Findley*, 105 F.3d at 688; *Green*, 843 F. Supp. 2d at 31.

Moreover, the information in Oliver's new declaration does not satisfy original-source requirements because it was not conveyed to the Government *before* Oliver filed this suit.  His generic assertion that "[a]ll of the communications with [Exchange] and Department of Defense officials occurred before I filed this action," (JA454, ¶ 12), is belied by his "continuing investigation" admissions and is regardless another "conclusory statement[]" that will "not suffice" for FCA juris-

diction. *Iqbal*, 556 U.S. at 678; *U.S. ex rel. Estate of Cunningham v. Millennium Labs. of Cal., Inc.*, 713 F.3d 662, 673-75 (1st Cir. 2013).

### B.    Oliver's Original-Source Claim Is Also Substantively Deficient.

Even if Oliver could overcome these fatal defects in his original-source claim, his new declaration provides no basis for reversing the district court's decision. First, the declaration confirms that Oliver discovered the essential elements of the fraud he alleges from conversations with third parties and reviewing public documents, and thus that he lacks the "direct and independent" knowledge of his claims that circuit law requires for original-source treatment. Second, even if the information he describes could qualify as "direct" or "independent" (it is neither), it fails the statutory test for original source because Oliver concedes that he discovered the Samoa-Guam pricing comparison at the heart of his current Complaint "*after* [he] filed this action." (JA454-55, ¶ 13.) Oliver thus could not have "voluntarily provided the [pricing] information [he describes] to the Government *before* filing [suit]." § 3730(e)(4)(B). Further, the Samoa-Guam comparison, which is the only specific transaction the Complaint describes, fails even to plead an MFC violation because it compares the prices PM USA's corporate affiliates charge overseas civilian customers in American Samoa with the prices PM USA charges the Navy Exchange in a different geographic market—Guam.

***Oliver's Declaration Describes No "Direct and Independent" Knowledge***.

An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based." § 3730(e)(4)(B). This definition "impose[s] a conjunctive requirement—direct *and* independent—on *qui tam* plaintiffs," *Quinn*, 14 F.3d at 656, and under circuit law, "direct" knowledge must be "first-hand." *Findley*, 105 F.3d at 690; (JA527-28). The district court held that the "substantial new details" in Oliver's declaration instead confirm that he "gained all of the information critical to his Complaint from other individuals." (JA526-27 (Oliver discovered the purported reason for the price disparity he cites "from his conversation with Tim Maloney" and from "various 'duty-free operators and overseas distributors,' including Kenny Hasegawa" (citation omitted)).)

Oliver concedes that he "first learned from [Navy Exchange official] Mr. Maloney" that PM USA was passing on allegedly domestic costs "in its prices to the Exchanges' overseas outlets." (OBr. 57.) But he says the district court "misread[]" his declaration in concluding that he "learned from third parties that PM USA was exempting overseas civilian buyers from those [alleged] surcharges." (*Id.*) Citing his conversation with Mr. Maloney, Oliver's brief says "he already *knew* that was the case based on his own prior experience." (*Id.*) But his Second Declaration says only that he "*believed* [these alleged exemptions were] *likely*," (JA450, ¶ 5), and that he was able to "verify" this belief only through his "industry

contacts," (JA451, ¶ 7)—the "duty-free operators and overseas distributors" the district court cited in holding that Oliver gained the information "critical to his Complaint from other individuals." (JA527.)

Oliver tacitly recognizes, (OBr. 59 n.16), that a relator who obtains secondhand "information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source." (JA527 (quoting *U.S. ex rel. Newell v. City of St. Paul*, 728 F.3d 791, 797 (8th Cir. 2013)); *see also id.* n.13 (citing authorities).) But he insists that this limitation does not apply where the secondhand information is "derived from" the relator's own "investigatory efforts." (OBr. 57.) Oliver misstates the law. "Investigatory efforts" will not preclude original-source status where a relator uses them to confirm or augment "direct and independent knowledge of essential information underlying" his claims. *Quinn*, 14 F.3d at 657. Oliver's declaration confirms that is not the situation here. And Oliver concedes that he discovered the only specific (Samoa-Guam) example of the alleged MFC violations underlying his Complaint from third-party conversations that occurred *after* he filed suit. (JA454-55, ¶ 13.) That is not enough for original-source status.

Oliver's unsubstantiated "belie[fs]," (JA450, ¶ 5), concerning certain overcharges, (JA449-50), also do not constitute "direct and independent knowledge" of facts suggesting "that fraud ha[s] been committed," *Quinn*, 14 F.3d at 657, and Ol-

iver concedes that his "verification" of these beliefs was "derived from" third-party conversations, (OBr. 57). The district court thus correctly held that the "investigations" Oliver describes do not support original-source status. That is apparent from *Quinn*, which involved an investigation that confirmed the relator's *personal knowledge* of critical facts regarding the false claims alleged. *See* 14 F.3d at 648, 657 (relator had "personal knowledge" that the defendant arbitrator "had no arbitral function to perform on several of the days for which he sought [government] pay" and relator called public phone numbers to confirm relator's own "direct and independent" knowledge that defendant was not working on the days for which he "billed the government for services pertaining to [relator's] arbitration").

Here, in contrast, Oliver's declaration identifies no "direct and independent knowledge" of any "essential information" underlying his fraud claims, and the few examples he purports to identify concern information that (like the phone log in *Quinn*) was already public. That is critical, because *Quinn* and other cases holding that an original source may "verify" direct knowledge through other sources do *not* encompass situations where the relator had no such knowledge to start with, or simply "discovered through investigation or experience what the public already knew." *U.S. ex rel. Reagan v. E. Tex. Med. Cntr. Regional Healthcare Sys.*, 384 F.3d 168, 179 (5th Cir. 2004). Moreover, even a relator who possesses some "direct and independent" knowledge of his claims may rely on an investigation to

support his case only where it "translate[s] into some *additional* compelling fact," or "demonstrate[s] a *new and undisclosed* relationship between disclosed facts, that puts a government agency 'on the trail' of fraud [that] might otherwise go unnoticed." *Id.*

Oliver argues that is the case here because his investigation revealed that "PM USA was exempting overseas civilian buyers from [two alleged] surcharges" that it was supposedly charging the Exchanges. (OBr. 57.)  But the disparity between Exchange and civilian pricing Oliver alleges was already disclosed in the Iceland Memo and evident to anyone comparing prices at Exchange commissaries and duty-free or overseas retail outlets.  And Oliver admits that the alleged source of the disparity—the purported "surcharge"—was disclosed in the Master Settlement Agreement, one of the most public litigation documents in recent history.  Accordingly, even if Oliver had some "direct" or "independent" knowledge of PM USA's pricing practices (he does not), the "investigations" he performed did not reveal anything new or essential to the fraud he asserts in his Complaint.  *See Reagan*, 384 F.3d at 179.

Oliver responds that, "even assuming his *verification* of his pre-existing knowledge that PM USA was not passing its [alleged] domestic surcharges on to overseas civilian purchasers" was not direct or new, "he was … 'directly' aware of *another* essential element of PM USA's [alleged] fraud—specifically, that the rel-

evant domestic surcharges … did not apply to overseas sales[.]" (OBr. 59 (emphasis original).) But Oliver's "knowledge" of this supposed legal conclusion is not essential to the fraud alleged in his Complaint, and regardless is based solely on his "experience" with the widely publicized Master Settlement Agreement. *Id*.[14] Such "background" "expertise" is not enough to support the original-source exception:

> [T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. … *If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a qui tam action cannot proceed.*

*Findley*, 105 F.3d at 688 (citations and quotation marks omitted). That is all Oliver has done here. At most he has relied on his "background" experience with public legal documents to place conclusory fraud labels on publicly-disclosed price differences. This case is thus just like those the district court cited and Oliver fails to distinguish. (OBr. 59 n.16.) Because Oliver's new declaration confirms that he is not an "insider[] with genuinely valuable information," but an "opportunistic plaintiff[]" with "no significant information to contribute of [his] own," he does not

---

[14] Oliver does not dispute that the Master Settlement Agreement was publicly disclosed for FCA purposes before 2008 in a civil hearing, the news media, and as a government report. *See Utah v. RJ Reynolds Tobacco Co.*, No. 96-CV-00829, Dkts. 394-2 to 394-9 (D. Utah July 14, 2006); *see also* http://www.pmdocs.com (available under Bates No. 2063540800) (last visited Sept. 29, 2015).

qualify for the original-source exception to the FCA's public-disclosure bar. *Quinn*, 14 F.3d at 649.

## CONCLUSION

This Court should affirm the judgment dismissing this case as jurisdictionally barred.

Respectfully submitted,

/s/ Elizabeth P. Papez

THOMAS J. FREDERICK
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL  60601*
*(312) 558-5600*

ELIZABETH P. PAPEZ
ANDREW C. NICHOLS
ERIC M. GOLDSTEIN
ERIC T. WERLINGER
WILLIAM B. JACKSON
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC  20006*
*(202) 282-5000*
*epapez@winston.com*

*Counsel for Appellee*
*Philip Morris USA Inc.*

OCTOBER 1, 2015

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this 1st day of October, 2015, served a copy of the foregoing Brief of Appellee Philip Morris USA Inc. by electronic filing on the following:

> Carl S. Kravitz
> Jason M. Knott
> ZUCKERMAN & SPAEDER LLP
> 1800 M Street, N.W.
> Suite 1800
> Washington, DC  20036
> Telephone: (202) 778-1800
> Facsimile: (202) 822-8106
> ckravitz@zuckerman.com
> jknott@zuckerman.com

> David S. Golub
> Silver Golub & Teitell LLP
> 184 Atlantic Street
> P.O. Box 389
> Stamford, CT  06904
> Telephone: (203) 325-4491
> Facsimile:  (203) 325-3769
> dgolub@sgtlaw.com

> *Counsel for Appellant*
> *Anthony Oliver*

> /s/ Elizabeth P. Papez
> ELIZABETH P. PAPEZ

> *Counsel for Appellee*
> *Philip Morris USA Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure ("FRAP") 32(a)(7)(B) because:

   This brief contains 13,877 words, excluding the portions exempted by FRAP 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because:

   This brief has been prepared in a proportionally spaced, 14-point, Times New Roman typeface using Microsoft Word 2010.


   /s/ Elizabeth P. Papez
   ELIZABETH P. PAPEZ

   *Counsel for Appellee*
   *Philip Morris USA Inc.*

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

31 U.S.C. § 3730(e) (2008)......................................................................... A1

**31 U.S.C. § 3730 (2008) … (e) Certain actions barred.—**

**(1)** No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

**(2)**

>**(A)** No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

>**(B)** For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C. App.).

**(3)** In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

**(4)**

>**(A)** No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

>**(B)** For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.